Thank you, Judge Loken, and I just want to interject that this is my first remote appearance in front of any court, and I'm so happy that it wasn't me. I was expecting it to be me with the technical glitches. May it please the court, my name is David Eanes, and I'm here with the Arkansas Attorney General's Office, and I represent Dexter Payne as the appellant who replaced Wendy Kelly at the ADC. Here, the district court granted habeas relief to Elliot Finch based on an alleged Sixth Amendment violation under Ferretta. In adopting the magistrate judge's finding and recommendations whole cloth, the district court erred in ignoring the limited collateral review that was supposed to be, that is to be conducted under the Anti-Terrorism and Effective Death Penalty Act. It did this in three ways. It ignored the limited review that should have been conducted regarding the equivocal request made by Mr. Finch as established by the record in requesting his right to waive counsel and to represent himself. It also did so by ignoring that there was evidence in the record supporting the state It also violated AEDPA and the limited collateral review by pronouncing his dicta something that the state appellate court found very important, which was on the initial occasion that Mr. Finch's request to represent himself was denied, there was a question of his confidence to do so. Going to that last point first, Mr. Finch's request, there's some argument in the record about how many times Mr. Finch requested to represent himself, however... Counsel, you can argue it any way you want, but I think the equivocal issue has to be first because if a court follows the federal appellate guidelines on the Ferretta issue, you don't reach competence to represent yourself as opposed to competence to stand trial until you've made the unequivocal request finding. So how can you start with, it is Act 3 as I understand from the briefs is competence to stand trial, not competence to represent yourself, so I'm confused on how this fits. Well under the precedent, the guiding precedent, it's Appellant Payne's position, particularly including under this court's decision in Mosley, that the ability to waive your right to counsel is even a higher standard. So if there was a question about Mr. Finch's competence, and there was at the October 19, 2015 hearing where this issue first arose, then the court had a duty to stop the proceedings and make a determination whether Mr. Finch was competent to request his right to waive counsel, whether it was knowing and voluntary. On that occasion, on October 19, 2015, during, that was a pre-trial hearing, trial was set to occur at that point in November, 2015. It began with a simple request about whether the defendant had witnesses for trial. His counsel replied that Mr. Finch did not, at which point Mr. Finch, without asking permission, interrupted, called his trial counsel a liar on the record, and when the trial court attempted to engage him in answering that simple question, he refused or was unable to do so. Which is this, October or March? This is October 19, 2015, the hearing, the pre-trial hearing. But the request was clearly made at ZX3 hearing in March, six months later. What does it matter what the dialogue in October? Well, I believe it was the district's court position that the October 19, 2015 hearing, the first occasion on which a request to represent himself was denied, was the first Ferretta violation. And the appellate pane would simply suggest that at that point, as noted in the record, Mr. Finch's inability to answer questions, simple direct questions, led the trial court to question his competence, at which Mr. Finch derailed that hearing as he had derailed proceedings all along by requesting another Act III exam. At that point, under state law and under the court's inherent duty to make sure the party in front of it were competent, that initial request to represent himself pro se was effectively derailed and stopped by the competency determination. Let me divert you to a question I was going to ask anyway, because it seems to me it's a threshold question. Do you disagree with any of the ways that Magistrate Judge Harris said the Arkansas trial court misapplied Ferretta in the addendum pages 19 and 20 of her opinion? Yes. Particularly... Does your brief identify exactly which of those conclusions were wrong? I'm not sure that it does in so many words, Your Honor, but certainly the trial court attempted on both occasions, on October 19th and March 10th, to engage in a Ferretta colloquy and was constantly interrupted and unable to complete that. Counsel, that's not in her findings conclusions. The first one is the trial court made no factual finding the request was equivocal. Do you disagree with that? I don't disagree that there was no finding. However, there was no duty on the part of the trial court, any guiding Supreme Court precedent for it to so find. In fact, that's... That's the most contentious thing you've said yet, because I don't agree with it. It wasn't asked to find whether... The trial court wasn't asked to find... It had a duty under Ferretta to make a determination, which is not entirely factual, that there has or has not been an unequivocal request to represent himself that triggers the duty to inquire whether he's competent to do so. And I would respectfully suggest at this stage we're making the same mistake that the district court did. We're effectively looking through the last... What Supreme Court case says it's a mistake to proceed in this fashion? Our cases certainly don't. Well, we're governed and limited to looking at the last reasoned opinion of the state appellate court and the state appellate court's decision. Yes, and if the state appellate court did misinterpret and misapplies Ferretta, then we're on to what was the error harmless, because now there has been an habeas error, a federal law. The district court did not say... In fact, said the opposite, said that the Arkansas Supreme Court did correctly apply the federal precedent in Ferretta, just that there was an unreasonable determination of facts based on the record. The district court's decision was limited to 2054 D2, whether there was an unreasonable determination of the facts. There was no D1 determination other than that the Arkansas Supreme Court had applied the correct federal precedent. Well, let me ask you this. Do you have any federal appellate authority that discusses the EDPA standard of review for what a made-by-state appellate court, which the state appellate court calls a finding? You cite quite accurately, is it Keimel or Scheimel out of the Sixth Circuit, but that was in an effective assistance case, as was Bert V. Titlow. So when you get into these, what's the standard of review? And you've got what is rather clearly a mixed question of fact and law. You've got a very complex inquiry, and I'm not aware of any federal appellate court that's made that inquiry in terms of these EDPA statutes on a Ferretta equivocal request issue. Are you? No, Your Honor, if I'm following the question. However, I would point out that I believe it's the district court that framed the appellate court, the state appellate court's determinations as quote-unquote finance of fact, when in fact, the state appellate court did what every state appellate court or any appellate court does. It reviewed the record to determine whether or not the trial court's actions were an error or were correct. Okay, let me stop you there. Do we have Arkansas law as to whether the Arkansas Supreme Court would review a trial court decision that a request was or was not unequivocal? What would the standard of review be, clear error or de novo? I believe it would be de novo, but I can't cite the case. I think so too, and that tells me that your argument about the presumption of correctness of a state court's fact finding does not apply to this issue. If that's the case, we still go back to the fact that if whether or not the determination based on the record was reasonable or not, and that's whether a fair-minded jurist, any fair-minded jurist could agree if there was room. That I agree with, but now we're past the first section of your brief, which argues about D2, D1, and presumptive correctness of fact findings. Now we're into the normal AEDPA review of state court decisions. That's true, and there hasn't been, although the Supreme Court has mentioned in cases that it was going to clear up any issue between D2 and E1, it has not yet done so. There seems to be a lack of guidance on that. This court has noted that- Wait a minute. Wait, wait, wait, wait. We just went past the D2, E1 issue. If you agree that the Arkansas courts, as well as I think the U.S. Supreme Court, would whether the state appellate court would treat it that way, Your Honor? You said you thought it would. I think it would. I think the U.S. Supreme Court, without a doubt, if it had a question, if it had a case that turned on whether there was an unequivocal request in a veredic context, would apply to a normal review because that's what they invariably do when it's a question they want to decide. That's right. And that was- If it's de novo review, then we can forget about the D2, E1 issue and just proceed to whether there was an erroneous conclusion that the state Supreme Court unreasonably applied for veredic. On the appellant's counsel, I apologize, may be getting lost between the difference of the standard review that the state appellate court would have applied on direct appeal to a factual or legal determination by the state trial court. I was attempting to clarify the inquiry whether the presumptive correctness of fact-finding standard, which you argue in your brief should apply, would apply to this mixed question of fact and law in the way I was getting at it. Let's start by looking at whether appellate courts review their own trial courts for clear or de novo on this issue. Because that's a pretty good indication of how this court should deal with that. I don't care if the district court called it a finding and reviewed it and triggered this presumptive correctness question. The question is how would appellate courts view it. That's right, except in this case- Then the question is whether the Arkansas Supreme Court conducted an unreasonable application of veredic in conducting its de novo review. And in this case, I would suggest that 2254 limits the district court's review, regardless of what the standard on direct appeal would be. Under the unequivocal findings, of course, Mr. Finch did request to represent himself, but you have to look at the context of the entire record here, and it's clear from the beginning that his primary goal was to obstruct or derail this trial in any way possible. He knew what was coming. That included replacing his appointed counsel with counsel, as the trial court would put on a show, would file frivolous pro se motions and adopt them as his appointed counsel would have refused to do back in September of 2015 on a speedy trial motion. That equivocation is seen also going into the March 10, 2016 hearing when they came back for the status of the second Act III report, and Mr. Finch's counsel pointed out to the trial court that Mr. Finch had a pro se motion pending to represent himself, at which point Mr. Finch immediately interrupted and said, new counsel. That hearing began with him clearly signaling to the court that he wanted new counsel and ended with a request for standby counsel. That's not inconsistent at all. I suppose I wasn't a trial judge, but I suppose as appellate court I've had a dozen FREDA cases, and the record always has this kind of seemingly obstructionist motive, and a defendant who he knows for sure he doesn't want his own counsel, and he's told he can't have substitute appointed counsel, and now his options are retain counsels, standby counsel, or represent himself with or without standby counsel. And he's perplexed and angry, and he creates this kind of record. But to me, that does not conclusively point one way or another on the equivocal issue. And I see that my time has run, I believe. No, please, please comment. Well, I agree that's one perspective. However, it's a state appellate court's with respect to termination here, and whether that was reasonable. There's support in the record for its determination. We cite to this, while it's not a decisive factor requesting standby counsel, that can be a factor, and we cite the court to the Stinson case. For the remainder of my argument, I'd adopt the points in my brief unless the court has further questions and would ask that the district court's grant of habeas relief be reversed and vacated. I have just one question. Yes, Your Honor. If we look at what the trial court had to say about its decision, at one point the trial court simply says, your request to self-represent yourself is going to be denied based on the likelihood of you getting some serious time. The court's going to deny the request, which doesn't seem like anybody's saying, hey, I think your obstructive behavior's in the way. And so while there is evidence that this is a difficult client, there's evidence that this is a client who's at odds with his lawyer. Where did the trial court ever say that the obstructionist problem was the primary problem? It seemed to me that that was, that's just sort of determined by the Arkansas Supreme Court rather than by the trial court itself. Well, that's correct, and the state, I'm sorry, Pelopane would suggest there's nothing wrong with that. Again, we're looking at the last reason, a decision which was the Arkansas Supreme Court, and it's very tempting to spill over and do a de novo review. Your Honor, you're correct that the trial court didn't make an express ruling about obstructionist conduct. However, that can be found in the record immediately prior to the ruling you just indicated when there was questioning in the colloquy, the Feretta Colloquy, about Mr. Finch's ability to understand and operate according to the rules. The prosecutors expressed some doubt about that. At that point is when, before there was any ruling on the Feretta request, that's the point that Mr. Finch requested standby counsel. That's the point at which the trial court said, you've got counsel, clearly indicating that he was, the trial court was still reading that as a motion to substitute or change counsel and said that you just, the only reason you're not asking for counsel, you're asking for someone to put on a show for you and I'm not going to do that. So while that wasn't the final ruling, I think that indicates that the trial court was looking to Mr. Finch's conduct at that point and declining that request. Thank you. Very good. Mr. Lambert. Good morning. I'm pleased to court. My name is Craig Lambert and I'm here on behalf of the appellee, Elliot Finch Jr. and it's a pleasure to be back in your court again. The district court's decision was eminently correct and Mr. Eames spent a lot of time in his brief arguing that she overstepped her bounds and did not get adequate deference and substituted her own independent judgment and that sort of thing. But just reading of the report and recommendation from the magistrate, it's very clear she did exactly what AEDPA requires her to do and the case law requires her to do. She reviewed the record. These lower federal court judges, they don't have to leave their common sense at home when they come to work every day. They read the record, they make a determination whether the state court decision was reasonable or not based on what's in that record and that's exactly what she did. It's too easy to argue, oh, she overstepped her bounds. That's not what she did here. It was a very thorough, well-reasoned decision that was entered. I want to talk, the two sort of big ticket issues here are, as you discussed, whether Mr. Finch's was unequivocal and also whether he engaged in disruptive conduct that prevented the fair and orderly exposition of the issues, the way the Arkansas Supreme Court phrased that, and on the question of unequivocal issue, I don't even think that's a close question. First of all, I want to point out the Arkansas Supreme Court decision, the dissent pointed out that the majority quote unquote reinvented the facts and it made factual findings that were not even made by the trial court and Judge Erickson, you brought this up a few minutes ago. The trial judge never made any finding that Mr. Finch was disruptive or was obstructing the proceedings or, as Mr. Eames said, trying to derail the entire court proceedings. The trial judge never made any findings like that at all. That's something that the Arkansas Supreme Court sort of created on its own. And there's case law out there that says an appellate court can't do that. They can't make findings of fact when there's not a record, a real developed record in the court below. Well, that's the real question here. I mean, because what you're really arguing is that there was an unreasonable determination of the facts made after the Arkansas court got to addressing the legal questions. And the question of an equivocal request actually is a mixed question of factor law. And there's facts in the record. And the Arkansas Supreme Court made a determination that the facts in the record fully supported a determination. And you're saying that that was an unreasonable factual determination. It's not simply enough to say, you know, they I mean, the dissent says they invented the facts out of whole cloth. And I guess that's what the dissent says. But the question is, were there, in fact, facts in the record that would sustain the determinations that were made? You know, and then our review is really whether or not those factual determinations were unreasonable. Right. So if a rational jurist could arrive at the conclusion that they're reasonably supported in the record, you know, and the question is, is that I mean, what did what it's not so much what the district court did at that point is what are we going to do when we look at those same circumstances? Right. So the Arkansas Supreme Court, they said that that it was equivocal. And the reasons that they gave really had nothing to do with whether it was equivocal. They said that because he he first asked for new counsel and then talked over the judge and then they talked about the three. But those really have more to do with whether he was obstructionist than whether it was equivocal. I think the equivocal question can be answered very easily. Well, he asked for new counsel twice early on in the proceedings. Then a long period of time went by. And then beginning in October of 2015 at the hearing at that pre-trial hearing, he asked clearly and unequivocally asked to represent himself four different times during that hearing. He said, I want to represent myself. That's all I'm asking. And he said that at different points in that hearing four times. Then later, and this may be the most compelling thing of all in this, is he filed a written motion. He had obviously read Ferretta versus California. He filed a written motion quoting from Ferretta, citing Ferretta. And that's probably the most unequivocal request of all. That was filed a few months later after he was denied his right to represent himself at the October hearing. He filed that motion. That was later addressed at the March hearing. And since Mr. Eames brought up this stuff, at that March hearing, it was a hearing, March 2016 hearing, it was a hearing on that written motion that he had filed. The words new counsel were uttered in that hearing. It didn't fit in with the whole dialogue at all. I don't know where those two words came from. I wouldn't say that that was, he was certainly not changing his mind. But everybody in that courtroom, the trial judge, the public defender, the prosecutor, Mr. Finch, and probably the bailiff and court reporter and anybody else that was listening in that courtroom knew that the topic of that hearing was for the court to decide on his request to represent himself. That's the way everybody understood it. And that's how the dialogue went. 99% of that hearing dealt with that issue. I understand that. There is the moment where Mr. Finch asked for standby counsel. The appellant's counsel argues on behalf of the state that that shows that there was greater equivocation than what Mr. Finch believes there is, at least at this point. Is such a request inconsistent, in your opinion, with self-representation? No. I agree with the magistrate on that. I could not find any support for the proposition that asking for standby counsel is sort of implied repudiation of the request to self-represent. There's no case law to support that. In fact, all it shows is that he was playing his cards in a smart way. And that standby counsel is routinely done anytime a defendant is granted the right to represent himself. And Feretta endorsed it. In a footnote in Frederick, California, the Supreme Court endorsed it. This court, panel of this court, in the Jones case, or the Jones v. Norman, also endorsed it as a sound way to go about handling situations like that. So he probably knew that and went ahead. I mean, it doesn't have anything to do with whether he was waffling on his insistence that he represent himself. He was very, very adamant about that for, gosh, over a year. And he never backpedaled. That's something that's key in this case. Arkansas Supreme Court tried to make a big deal out of the fact that he first asked for new counsel. But once he started asking to represent himself, he never walked that back at all. You know, there seems to be an underlying current in here that talks about people being about Mr. Finch being difficult and that somehow that difficult difficulty as a client and his strong interest in how the case is prosecuted can be determined or decided to be an attempt to obstruct or delay rather than a difference of opinion on the theory of the case that ought to be presented. Right. And and I would just like you to address that particular question. And particularly in light of the fact is that, you know, I was a trial judge for an awful long time. And usually the obstruction piece comes floating out after you've said you could represent yourself. And the guy starts behaving in a way that demonstrates beyond all question that really his goal here is to completely disrupt the proceedings, turn them into a circus and and create problems. And, you know, and and I'm a little concerned about the timing of this decision it's made before, you know, he has an opportunity to represent himself and and to actually get into trouble with the obstruction. I'm just curious what your thoughts are. You're you're concerned about the timing of the decision not to not allow him to represent himself. Right. And then the Arkansas Supreme Court making a determination that the factual record supports a finding of obstruction. Right. And so if that's a reasonable finding, my question is, what's the timing that one needs to be obstructive? I mean, sometimes guys are completely obstructive all the way along. Years ago, there was a case where a guy laid down on the floor and just refused to move, but wanted to represent himself, which seemed to be sort of not not a good way to go. And it wasn't my case. It was another colleague in my case who was a state judge. But but but I get where you could say we don't got to wait till you're actually representing yourself to realize you're a problem. Right. But in this particular case, there seems to be mostly a difference of opinion on how the case proceed and what the theories of defense ought to be. And those theories may be unwise. They may be improvident. They may be not very legally sound. But the timing of the decision, to me, is is is it's hard to look at what the district, the trial court decided, and then look at what the Arkansas Supreme Court said was the I didn't see the kind of obstruction that in that record. But whether or not that was an unreasonable finding, that's ultimately the issue. Right. Right. Yes. And the the trial judge. Well, at the hearing on September 5th in September of 2015, it was a special judge sitting that day. And he denied denied the request for some really bizarre reasons. And then and then it was denied again later in 2016. But I haven't really thought much about the timing of because there are two two decisions  and there are, I guess, six six months apart from each other. So you said September 2015. Did you mean the October hearing or the special? I meant to say October 2015. There was an earlier hearing in September. Counsel. I'm sorry. Yeah. Let me ask you this question. I tend to agree with Judge Logan's comment earlier, as I understood it, that this really is a D2 case, a case involving determination of facts, because we know what the facts are. Everybody knows what the facts are. The historical facts of who said what, when, what was filed and what the ruling of the case. So if we look at it as a D1 case, an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Is it only for what? What other Supreme Court cases, Supreme Court law would you would you cite that you think was unreasonably applied by the Arkansas, by the trial court and the Arkansas Supreme Court? Or maybe it's only for it to give you an opportunity to comment on that. I think for it pretty much says it all. I think that's that's probably I mean, there may be Supreme Court decisions that follow up on Feretta that be relevant. But that's 19, I think 1975 decision. And, you know, been well, well settled law for decades. Now, that's that's the clearly established federal law. I would have to do some research, I guess, to see if I could come up with any other angle on the 2254 D1 question. I did argue 2254 D1, not really to the extent that I wanted to, because the in the court below the court court gave a certain specific questions that she wanted us to answer in our briefs. And but I mean, I think clearly, if we look at the trial, what the trial court did is every part of Feretta that exists was that court didn't comply with Fred Feretta in the least. And I think the same could be said for the for the Arkansas Supreme Court, but especially the trial court. Both times when it when it made those oral oral rulings denying his his request, they were just they didn't have anything to do with Feretta. So that doesn't answer your question very well, but I'm going to it's something now that I want to look up after our argument is over with. But on the on the question. So so so he makes six six separate requests to represent himself. He never backpedals or walks that back at all. And the the request for standby counsel is really irrelevant. One thing I want to just this may or may not be an issue with the court. But on the question of all of the act three, the the the mental exam issues in the case, there's there's been a lot of argument, Mr. Means, that the magistrate ignored his dicta. The Arkansas Supreme Court's discussion of this and its reliance on a may have a state. And and Arkansas Supreme Court basically said you can't decide whether whether a defendant can can knowingly, voluntarily and intelligently waive counsel unless the competence and this is competency has been determined. Well, in this case, whether it's dicta or not, I mean, I don't care if it's called a holding or dicta. Would that reasoning by the Arkansas Supreme Court is fundamentally flawed and unreasonable because there had already been a a an act very evaluation and it was done eight or nine months earlier. And he passed it with flying colors. And the examiner even even concluded that he's he's he's 100 percent competent. It's no no mental health issues whatsoever. And not only that, but he is fully able to decide for himself that it's not a good idea for him to cooperate with the part of the exam dealing with his mental health at the time of the crime and also fully, fully capable of cooperating with with with his attorney. And there's even some language about in there, I think, by representing himself that that thing had already been made. So that for the Supreme Court to rely on that, saying that there's been there's been no evaluation done, no determination is just just not only unreasonable, it's just false. That's true. And on that point is is an act. It is a there is a difference between competence to stand trial and competence to represent to represent yourself. And I think the latter requires more greater competence. As Mr. Eanes said, is an act three determination. Is it called an act three determination when a court makes the Feretta competence determination? Or is act three a reference to the more common determination of competence to stand trial? It's it's it's a more traditional, you know, whether the defendant suffers from a mental disease or defect, it might be he might be able to use as a defense at trial. But there's no indication anywhere in this case that that Mr. Finch suffered from any mental health issues. He he wasn't behaving in a bizarre way. He wasn't hallucinating. He wasn't, you know, talking strange. And his written motions, too. Yes. But the competence to represent yourself includes the mental horsepower, so to speak, to do the job as a lay person. Does that have nothing to do that can have nothing to do with mental health? Correct. And that's the mental health evaluators found absolutely nothing to suggest that he wasn't able to to to represent himself or or assist counsel. There's just nothing. There's just nothing there. And, you know, defendant is presumed competent. It's unreasonable for her if this is what a trial court wants to do. If he wants to just say, well, we've got to get we've got to get a competency exam done on you before I can make this decision. And then it comes back and it's everything's fine. Well, you know, it's been a month now. And, you know, your mental health can change can change from time to time. We got to get another one done now. There were actually two that my time is up. There were actually two done in this case. If there are no more questions, thank you for your time. And we ask that you affirm the judgment of the district court. Thank you, Mr. Lambert. And the court greatly appreciates your assistance as a point of counsel on the criminal justice act. Thank you, Your Honor. I think you have some time for rebuttal. Thank you, Your Honor. Here's about a minute there on the clock. First of all, addressing the obstructionist conduct issue. I want to be clear that there are no precise contours of the federal precedent, no Supreme Court decision about exactly what obstructionist conduct is that for. It's interesting was a case about pretrial conduct. It didn't concern the trial. The famous footnote where the obstructionist conduct advice comes into play is future advice here because there's no precise. So there's lots of authority about obstructionist conduct by my defendant who is representing himself, including the famous Supreme Court case where they upheld kicking the defendant out of the courtroom. The questions today have been about a range, and I merely wanted to point out that there's no guidance on that. The district court, of course, pulled out some extreme examples. But you don't have to set the courthouse on fire and curse the bailiff in order to be seen to manipulate, subvert or delay the trial process. And here the record is replete with that. And we cite some examples in our brief from this court's precedent. Now, those were direct appeals, not habeas cases, but an Eidelman and Mosley where there was conduct closer to what we see here. There were continuances at the last minute trying to delay trial and other things of that sort. Here we know, for example, that Mr. Finch in his initial act three had refused, even though he had asserted a mental disease or defect defense. He refused to cooperate with that. And then in November, the hearing that Mr. Lambert mentioned, the hearing where there was a substitute judge, two days before the November trial, he came into court for a pretrial and again derailed the trial by asserting a mental disease or defect defense, promised the court on the record that he'd cooperated with it this time at the trial court, continued the trial for him to assert that defense. And then sure enough, when the exam was conducted once again, he absolutely asserted he never intended to assert that defense. That initial act three, it took close to a year before that was completed. And again, it was months from the November 2015 trial that was derailed because of this act three request till November of 2016 when trial was finally had again. I would also point out that he, Mr. Lambert, my colleague, has said there was no evidence in the record about competence. But we know that that January 2015 report, finding him competent to proceed, was eight or nine months prior to the October 19th hearing. And we know from, for instance, cases like Edwards, that that's a determination the competency to waive counsel must be presumed against if possible. And that it's not a static determination. The burdens on the trial court, given the circumstances at the time, to make that determination. And the court can read the colloquy. It's been set out in several places. But it's obvious that Mr. Finch was unable to comport himself during that hearing to the point that the trial judge had reason to question his competence. And then Mr. Finch, seeing that the hearing wasn't going his way, whether intentionally a strategic decision, as the appellee puts it in their brief before this court, or whether it was due to competence, derailed the hearing on his own request to proceed pro se by requesting another act three. And I see my time is run unless there's further questions. Very good, counsel. The case has been thoroughly briefed and well argued. It presents important issues and the court will take it under advisement. Thank you for your help.